**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**

-----------------------------------------------------------------------X

TOWN OF SOUTHAMPTON,

Plaintiff,

-against-

3M COMPANY, f/k/a Minnesota Mining and Manufacturing Co., BUCKEYE FIRE EQUIPMENT COMPANY, CHEMGUARD, INC., TYCO FIRE PRODUCTS L.P., NATIONAL FOAM, INC., ANGUS INTERNATIONAL SAFETY GROUP, LTD, ANGUS FIRE ARMOUR CORPORATION, E.I DUPONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC, LLC, individually and as successor in interest to DuPont Chemical Solutions Enterprise, CORTEVA, INC., DUPONT DE NEMOURS INC., f/k/a DOWDUPONT, INC., ARCHROMA MANAGEMENT LLC, ARKEMA INC., ARKEMA FRANCE, S.A., AGC, INC. f/k/a ASAHI GLASS CO. LTD., DAIKIN INDUSTRIES LTD., DAIKIN AMERICA, INC., DYNAX CORPORATION, SOLVAY SPECIALTY POLYMERS, USA, LLC., AMEREX CORPORATION, KIDDE-FENWAL, INC., KIDDE, P.L.C., INC., UTC FIRE & SECURITY AMERICAS CORPORATION, INC., UNITED TECHNOLOGIES CORPORATION, CHUBB FIRE LTD., CLARIANT CORPORATION, and BASF CORPORATION,

Defendants.

-----------------------------------------------------------------------X

Master Docket No: 2:18-mn-2873
Civil Action No:  2:19-cv-3502-RMG

**COMPLAINT**

**Jury Trial Demanded**

Plaintiff, the Town of Southampton,  by and through its attorneys, Napoli Shkolnik PLLC, as and for its  complaint against Defendants, 3M COMPANY, f/k/a Minnesota Mining and Manufacturing Co., BUCKEYE FIRE EQUIPMENT COMPANY, CHEMGUARD, INC., TYCO FIRE PRODUCTS L.P., NATIONAL FOAM, INC., ANGUS INTERNATIONAL SAFETY GROUP, LTD, ANGUS FIRE ARMOUR CORPORATION, E.I DUPONT DE NEMOURS AND

COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC, LLC, individually and as successor in interest to DuPont Chemical Solutions Enterprise, CORTEVA, INC., DUPONT DE NEMOURS INC., f/k/a DOWDUPONT, INC., ARCHROMA MANAGEMENT LLC, ARKEMA INC., ARKEMA FRANCE, S.A., AGC, INC. f/k/a ASAHI GLASS CO. LTD., DAIKIN INDUSTRIES LTD., DAIKIN AMERICA, INC., DYNAX CORPORATION, SOLVAY SPECIALTY POLYMERS, USA, LLC., AMEREX CORPORATION, KIDDE-FENWAL, INC., KIDDE, P.L.C., INC., UTC FIRE & SECURITY AMERICAS CORPORATION, INC., UNITED TECHNOLOGIES CORPORATION, CHUBB FIRE LTD., CLARIANT CORPORATION, and BASF CORPORATION, (collectively "Defendants") alleges, upon information and belief, as follows:

## NATURE OF THE CASE

1.      The Town of Southampton ("Southampton" or "Plaintiff") is one of ten towns located in Suffolk County, New York. It is located partly on the South Fork of Long Island, encompassing an area of approximately 90 acres.

2.      Southampton is the largest and most populous of the five East End towns of Suffolk County with a population of nearly 60,000 people.

3.      The groundwater in Southampton has been contaminated by per- and polyfluoroalkyl substances (collectively "PFAS").

4.      PFAS was an integral part of aqueous film-forming foam ("AFFF") that was used for decades during operations and fire training sessions at the Francis S. Gabreski Airport and/or at the Air National Guard base located in the Airport (collectively "Gabreski" or "Airport").

5.      All Defendants manufactured, marketed, and sold AFFF used at numerous military

2

bases and other locations throughout the country, including at Gabreski.

6.    Defendants were aware that PFAS chemicals are toxic to animals and humans, do not biodegrade, are persistent in the environment, move easily through soil and groundwater, and pose a significant risk to the environment and human health. Nevertheless, they elected to manufacture, market, and sell these chemicals, placing profits over human health and the environment.

7.    Defendants designed, manufactured, marketed, and sold their products with knowledge that large quantities of PFAS would be stored, used, and maintained in such a manner that these toxic chemicals would be released into the environment, contaminating the air, soil, and groundwater.

8.    AFFF products containing PFAS were purchased, consumed, used, mixed, stored, handled, transported, discharged, released, and/or disposed of at Gabreski.

9.    As a result, PFAS leached into the air, soil, and groundwater at and surrounding the Airport, contaminating the environment and poisoning the groundwater on and off site.

10.    The resulting PFAS contamination has impacted public water supply wells, as well as private water wells, including those located within Southampton in the areas of Quogue and East Quogue.

11.    In order to assure safe drinking water to its residents, Southampton been involved in the distribution of bottled water in the impacted areas.

12.    Southampton is also working with the Suffolk County Water Authority to provide for the extension of public water mains and to connect properties served by contaminated private wells to these mains and to a safe clean water supply.

13.    To finance this work and to provide financial assistance to its residents with

contaminated private wells, Plaintiff has already allocated $4 million dollars from the town's Community Preservation Fund.

14.    These and other costs have been and will be incurred by Plaintiff as a direct and proximate result of Defendants' wrongful acts and omissions.

15.    The Town of Southampton should not have to bear these costs; they should be borne by the Defendants, who are responsible for the PFAS contamination.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over the Defendants pursuant to 28 U.S.C. §1332(a), as the parties are diverse in citizenship and the amount in controversy exceeds $75,000.

17.    For purposes of the claims alleged herein, the District Court for the Eastern District of New York is the home venue, defined as the proper venue of origin where the claims could have otherwise been brought pursuant to 28 U.S.C. § 1391.

18.    Plaintiff is a municipality in the Eastern District of New York.

19.    The acts and omissions complained of occurred in this district.

20.    At all relevant times, Defendants conducted business  throughout the United States, including in the Eastern District of New York and in Suffolk County.

21.    Pursuant to the case management orders of this Court in MDL No. 2:18-mn-2873-RMG (CMO 3), this complaint is being filed directly with this Court.

## PARTIES

**Plaintiff**

22.      The Town of Southampton is a municipal corporation duly organized and existing by virtue of the laws of the State of New York, with its principal place of business at 116 Hampton Road, Southampton, New York 11968.

**Defendants**

23.      The term "Defendant" or "Defendants" refers to all Defendants named herein jointly and severally.

24.      When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

25.      At all times relevant to this litigation, each of the Defendants conducted business throughout the United States, including in New York.

26.      At all times relevant to this litigation, each of the Defendants designed, developed, manufactured, marketed and sold AFFF products containing PFAS and used at numerous military bases and other locations throughout the country, including Gabreski Air National Guard Base and/or Francis S. Gabreski Airport.

27.      At all times relevant to this litigation, Defendants were legally responsible for and committed each of the tortious and wrongful acts alleged in this Complaint.

28.     Defendants' wrongful actions and omissions resulted in the contamination of the groundwater in Southampton with PFAS and caused Plaintiff's damages.

29.     **3M Company f/k/a Minnesota Mining and Manufacturing Co. ("3M Company")** is a corporation organized and existing under the laws of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55144.

30.     Beginning before 1970 and until at least 2002, 3M Company manufactured, distributed, and sold AFFF containing PFAS.

31.     **Buckeye Fire Equipment Company ("Buckeye")** is a corporation organized and existing under the laws of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

32.     **Chemguard, Inc.** is a corporation organized and existing under the laws of Texas, with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

33.     Beginning in or around 1994, Chemguard began manufacturing AFFF that contained PFOA.

34.     On information and belief, Chemguard is a subsidiary of Johnson Controls International PLC, an Irish public limited company listed on the New York Stock Exchange.

35.     **Tyco Fire Products L.P. ("Tyco")** is a limited partnership organized under the laws of Delaware, with its principal place of business at 1400 Pennbrook Parkway, Landsdale, Pennsylvania 19446.

36.     On information and belief, Tyco is a subsidiary of Johnson Controls International PLC, an Irish public limited company listed on the New York Stock Exchange.

37.     Tyco is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990.

6

38.    Beginning in or around 1975, Ansul manufactured and/or distributed and sold AFFF that contained PFAS. After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute and sell AFFF that contained PFAS.

39.    On information and belief, Tyco acquired the Chemguard brand in 2011 and continues to sell Chemguard products through its Chemguard Specialty Chemicals division.

40.    **National Foam, Inc.** ("National Foam") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 141 Junny Road, Angier, North Carolina 27501 and at 350 East Union Street, West Chester, Pennsylvania 19382.

41.    On information and belief, National Foam is a subsidiary of Angus International Safety Group, Ltd.

42.    **Angus International Safety Group, Ltd.** is a foreign private limited company, with offices at Station Road, High Bentham, Near Lancanster, United Kingdom LA2 7NA.  Upon information and belief, Angus International is registered in the United Kingdom with a registered number of 8441763.

43.    **Angus Fire Armour Corporation** ("Angus Fire") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 141 Junny Road, Angier, North Carolina 27501.

44.    On information and belief, Angus Fire is a subsidiary of Angus International Safety Group, Ltd.

45.    **E.I. DuPont de Nemours & Company ("DuPont")** is a corporation organized and existing under the laws of Delaware, having a principal place of business is 974 Centre Road Wilmington, Delaware 19805.

46.     DuPont is a successor in interest to DuPont Chemical Solutions Enterprise ("DuPont Chemical"), a Delaware corporation with a principal place of business located at 1007 Market Street Wilmington, Delaware 19898.

47.     DuPont Chemical was a member of the Telomer Research Program ("TRP"). As a member, it was required to provide a list and volume of products it was selling in the United States on a yearly basis.

48.     In a letter addressed to the Office of Pollution Prevention and Toxics (OPPT) Document Control Office, dated May 14, 2003 and signed by Stephen H. Korzeniowski, DuPont provided its Telomer-based sales products in the United States for the year 2002.

49.     The letter, which was redacted and sent to the USEPA under its PFOA Stewardship Program, included AFFF sales volume, on an active ingredient pound basis, as well as its Chemical Abstracts Service (CAS) number and chemical name, and is included in the PFOA Stewardship Program Docket.[1]

50.     **The Chemours Company ("Chemours")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 1007 Market Street, Wilmington, Delaware 19889.

51.     Chemours is a successor in interest to DuPont Chemical, as described above.

52.     **The Chemours Company FC LLC ("Chemours FC")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 1007 Market Street Wilmington, Delaware 19899.

53.     Chemours FC is a successor in interest to DuPont Chemical, as described above.

---

[1] https://www.regulations.gov/docket?D=EPA-HQ-OPPT-2006-0621.

54.    **Corteva, Inc. ("Corteva")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 974 Centre Rd., Wilmington, Delaware 19805.

55.    **Dupont de Nemours Inc**. **f/k/a DowDuPont, Inc. ("Dupont de Nemours Inc.")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and 2211 H.H. Dow Way, Midland, Michigan 48674.

56.    On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva.

57.    Corteva was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

58.    On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a pro rata dividend. Following that distribution, Corteva became the direct parent of E. I. Du Pont de Nemours & Co.

59.    Corteva holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

60.    On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the above described spin-offs, as well as the balance of the financial assets and liabilities of E.I DuPont not assumed by Corteva.

61.    Defendants E. I. Du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

62.   **Archroma Management LLC ("Archroma")** is a foreign corporation existing under the laws of the country of Switzerland and having a principal office at Neuhofstrasse 11, 4153 Reinach, Switzerland.

63.   Archroma is a provider of dyes and specialty chemicals serving textiles, packaging, paper, coatings, adhesives and sealant markets.

64.   In 2013, it acquired the Textile Chemicals, Paper Specialties, and Emulsions businesses from Clariant Corporation in 2013, a successor to Sandoz Chemical Corporation, both of which conducted business in New York.

65.   **Arkema Inc.** is a corporation organized and existing under the laws of Pennsylvania, having a principal place of business at 900 First Avenue, King of Prussia, PA 19406.

66.   Arkema Inc. develops specialty chemicals and polymers.

67.   Arkema, Inc. is an operating subsidiary of defendant, Arkema France, S.A.

68.   **Arkema France S.A. ("Arkema France")** is a publicly traded foreign corporation with its principal place of business in Colombes, France.  Arkema France S.A. is the parent corporation of defendant, Arkema Inc.

69.   Arkema France and Arkema Inc. are collectively referred to herein as "Arkema".

70.   **AGC, Inc. f/k/a Asahi Glass Co. Ltd. ("AGC")** is a foreign corporation organized under the laws of Japan, having a principal place of business in Tokyo, Japan.

71.   AGC manufactures specialty chemicals. It offers glass, electronic displays and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates.

72.   **Daikin Industries, Ltd.** is a corporation organized under the laws of Japan, having its principal place of business in Osaka, Japan.

73.    **Daikin America, Inc.** is a corporation organized and existing under the laws of Delaware, having its principal place of business at 20 Olympic Drive, Orangeburg, New York 10962.

74.    Daikin America, Inc. was established in 1991 and is a subsidiary of Daikin Industries Ltd.

75.    It is a developer and manufacturer of fluorochemical products, including fluoropolymers, fluoroelastomers, and fluorocarbon gas.

76.    Daikin Industries, Ltd. and Daikin America, Inc. are collectively referred to herein as "Daikin."

77.    **Dynax Corporation ("Dynax")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 79 Westchester Avenue, Pound Ridge, New York 10576 and an address for service of process at 103 Fairview Park Drive Elmsford, New York 10523-1544.

78.    On information and belief, Dynax (f/k/a Daikin-R/M Co, Ltd.) entered the AFFF business in 1991, quickly becoming a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents.

79.    **Solvay Specialty Polymers, USA, LLC ("Solvay")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 4500 McGinnis Ferry Road, Alpharetta, GA 30005.

80.    **Amerex Corporation ("Amerex")** is a corporation having principal place of business at 7595 Gadsden Highway, Trussville, AL 35173.

81.    Amerex is a manufacturer of firefighting products. Beginning in 1971, it was a manufacturer of hand portable and wheeled extinguishers for commercial and industrial applications.

82.    **Kidde-Fenwal, Inc. ("Kidde-Fenwal")** is a corporation organized under the laws of Delaware, having a principal place of business at One Financial Plaza, Hartford, Connecticut 06101. Kidde-Fenwal is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire").

83.    Upon information and belief, Kidde-Fenwal, Inc. is part of the UTC Climate Control & Security unit of United Technologies Corporation.

84.    **Kidde P.L.C., Inc. ("Kidde P.L.C.")** is a foreign corporation organized and existing under the laws of Delaware, having a principal place of business at One Carrier Place, Farmington, Connecticut 06034.

85.    **UTC Fire & Security Americas Corporation, Inc. ("UTC Fire")** is a North Carolina corporation, having a principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092.

86.    On information and belief, UTC Fire acquired Kidde P.L.C. in 1991 and joined it with Chubb.

87.    On information and belief, UTC Fire is a subsidiary of United Technologies Corporation.

88.    **United Technologies Corporation ("United Technologies")** is a foreign corporation organized and existing under the laws of Delaware, having a principal place of business at 8 Farm Springs Road, Farmington, Connecticut 06032.

89.    **Chubb Fire, Ltd. ("Chubb")** is a foreign private limited company, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is registered in the United Kingdom with a registered number of 134210. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc.

90.    **Clariant Corporation ("Clariant")** is a corporation organized and existing under the laws of New York, having a principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.

91.    On information and belief, Clariant was formerly known as Sandoz Chemicals Corporation and as Sodyeco, inc.

92.    **BASF Corporation, ("BASF")**, is a corporation organized and existing under the laws of Delaware, having a principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932.

93.    On information and belief, BASF is the largest affiliate of BASF SE and the second largest producer and marketer of chemicals and related products in North America.

94.    On information and belief, BASF Corporation is the successor in interest to Ciba, Inc., a Swiss specialty chemicals company.

## FACTUAL ALLEGATIONS AS TO ALL COUNTS

### PFOA and PFOS and Their Risk to Public Health and the Environment

95.    PFAS are chemical compounds containing fluorine and carbon. These substances have been used for decades in the manufacture of, among other things, household and commercial products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

96.     The two most widely studied types of these substances are perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonate ("PFOS"), which each contain eight carbon atoms.

97.     PFOA and PFOS have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning that they pose serious health risks to humans and animals.

98.     PFOA and PFOS easily dissolve in water, and thus they are mobile and easily spread in the environment. PFOA and PFOS also readily contaminate soils and leach from the soil into groundwater, where they can travel significant distances.

99.     PFOA and PFOS are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA and PFOS are thermally, chemically, and biologically stable. They resist degradation due to light, water, and biological processes.

100.     Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

101.     PFOA and PFOS bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant periods of time. Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present. In humans, PFOA and PFOS remain in the body for years.

102.    PFOA and PFOS biomagnify up the food chain. This occurs, for example, when humans eat fish that have ingested PFOA and/or PFOS.

103.    The chemical structure of PFOA and PFOS makes them resistant to breakdown or environmental degradation. As a result, they are persistent when released into the environment.

104.    Exposure to PFAS is toxic and poses serious health risks to humans and animals.

105.    PFAS are readily absorbed after consumption or inhalation, and accumulate primarily in the blood stream, kidney, and liver.

**Defendants' Manufacture and Sale of PFAS Despite Known Risks**

106.    In the 1940's, 3M Company began using a process called electrochemical fluorination to create carbon-fluorine bonds, which are key components of PFAS.

107.    3M Company soon discovered that these types of substances have strong surfactant properties, meaning that they reduce the surface tension between a liquid and another liquid or solid. This reduced surface tension enabled 3M Company to develop a myriad of products that resist heat, stains, oil, and water. These products included older forms of Scotch Gard, which contained PFAS and when applied to fabric, furniture, and carpets protected against liquids and stains.

108.    Upon information and belief, by at least the 1970s, 3M Company knew or should have known that PFAS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

109.    In 1975, 3M Company concluded that PFOS was present in the blood of the general population. Since PFOS is not naturally occurring, this finding should have alerted 3M Company to the possibility that their products were a source of these chemicals. The finding also should have alerted 3M Company that PFOS is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics explain the absorption of PFOS in blood after contact with 3M's products.

110.    Upon information and belief, 3M Company concealed this knowledge from the public and government regulators its knowledge of the risk of harm posed by PFOS.

111.    In 1976, 3M Company found PFOA in the blood of its workers. This finding should have alerted 3M Company to the same issues raised by the findings regarding PFOS in the prior year.

112.    A 1978 study by 3M Company showed that PFOA reduced the survival rate of fathead minnow fish eggs. Other studies by 3M Company in 1978 showed that PFOS and PFOA are toxic to rats, and that PFOS is toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS.

113.    Studies by 3M Company after the 1970s also showed adverse effects from exposure to PFOA and PFOS. In a 1983 study, for example, 3M Company found that PFOS caused the growth of cancerous tumors in rats.

114.    A study proposal by 3M Company in 1983 stated that the resistance to degradation of PFOA and PFOS made them "potential candidates for environmental regulations, including further testing requirements under laws such as the Toxic Substances Control Act." 3M Environmental Laboratory (EE & PC), Fate of Fluorochemicals - Phase II, at p.6 (E. A. Reiner, ed. May 20, 1983).

115.    A 1997 material safety data sheet ("MSDS") for a non-AFFF product made by 3M Company listed its only ingredients as water, PFOA, and other per-fluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M Company and DuPont" as support for this statement. On information and belief, 3M's MSDS's for AFFF, which contained PFOA, did not provide similar warnings.

16

116.    In an attempt to limit liability, 3M Company opted to stop producing PFAS in 2002 because it was aware of the looming chemical exposure and health effects on the public.

117.    Federal law requires chemical manufacturers and distributors to immediately notify the United States Environmental Protection Agency ("EPA") if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e).

118.    3M Company did not comply with its duty under TSCA, and, in April 2006, it agreed to pay EPA a penalty of more than $1.5 million for, among other things, its failure to disclose studies regarding PFAS dating back decades.

119.    DuPont also did not comply with its duty under TSCA and the Resource Conservation and Recovery Act (RCRA), and, in 2005, agreed to pay $10.25 million, the largest civil administrative penalty that EPA had ever obtained to that date under any federal statute. The TSCA violations of Section 8(e) specifically addressed the company's failure to report to EPA the substantial risks of PFOA.

**Defendants' Manufacture and Sale of AFFF Despite Known Risks**

120.    In 1951, 3M began selling its PFAS to other chemical companies, including DuPont.

121.    Other companies, including Defendants, began manufacturing AFFF using PFAS that they produced themselves or purchased from other companies.

122.    Defendants voluntarily elected to include PFAS in their AFFF.

123.    Defendants knew or should have known that PFAS are highly soluble in water, extremely mobile, persistent, and very likely to contaminate drinking water wells and present significant risks to human health and welfare if released into the environment.

124.    Nevertheless, Defendants manufactured, marketed, and sold their AFFF with the knowledge that PFAS would be released into the environment in firefighting training and rescue exercises, inadvertent releases, as well as in emergencies.

125.    Upon information and belief, instructions, labels and material safety data sheets for AFFF provided by Defendants did not, for significant time periods, fully describe the health and environmental hazards of AFFF, which Defendants knew or should have known at the time of distribution.

126.    Upon information and belief, Defendants knew of these health and environmental hazards for years, yet failed to warn the users and other sensitive receptors, such as public water providers.

127.    AFFF concentrate containing PFAS forms foam when it is mixed with water and ejected from a nozzle. That foam is then sprayed so that it coats the fire, blocking the supply of oxygen feeding the fire and creating a cooling effect and evaporation barrier to extinguish the vapors on fire. A film also forms to smother the fire after the foam has dissipated.

18

128.    Civilian and military airports, fire departments and industrial facilities, unaware of the environmental and health risk and hazards of using Defendants' AFFF, used AFFF containing PFAS for decades for firefighting and training.

129.    These sites have been linked to the widespread contamination of surface and groundwater, as well as public drinking water wells throughout the country with PFAS.

130.    On information and belief, all Defendants knew or should have known that in its intended and/or common use, AFFF containing PFAS would very likely injure and/or threaten public health and the environment.

131.    On information and belief, this knowledge was accessible to all Defendants. For example, in 1970 a well-established firefighting trade association was alerted to the toxic effects on fish of a chemical compound related to PFOS. On information and belief, at least the following Defendants are and/or were members of this trade association: 3M Company, Tyco/Ansul, Chemguard, and National Foam/Angus.

132.    Additionally, on information and belief, all Defendants knew or should have known that their AFFF products and the PFAS the products contained, easily dissolve in water, because the products were designed to be mixed with water; are mobile, because the products were designed to quickly form a thin film; resist degradation, because that is the nature of the products' chemical composition, and tend to bioaccumulate, because studies regarding the presence of substances with carbon-fluorine bonds in the blood of the general population were publicly available beginning in, at least, 1976.

133.    In or about 1977, Tyco/Ansul was also aware of the environmental and toxic concerns of its AFFF and undertook a study and investigation on more environmentally improved AFFF.

134.    There is no natural sink for AFFF containing PFAS. Except for incineration above 10,000 degrees, Defendants' PFAS will eventually accumulate in the water and all living organisms - including the blood and organs of humans and livestock.

135.    Plumes of PFAS can persist in underground aquifers for many decades. Once the plume reaches a well, it continues to contaminate the water drawn from that well.

**AFFF Containing PFAS is Fungible and Commingled in the Groundwater**

136.    Once it has been released to the environment and groundwater, AFFF containing PFAS, lacks characteristics that would enable identification of the company that manufactured that particular batch of AFFF.

137.    The process of manufacture and distribution of AFFF, including that which contains PFAS, sometimes includes complex arrangements whereby Defendants sell product for delivery through specific military bases and/or third-party logistic intermediaries throughout the country.

138.    A subsurface plume, even if it comes from a single location, such as a retention fire training area, most likely originates from mixed batches of AFFF containing PFAS coming from different manufacturers.

139.    The case at Gabreski is typical: even though several areas were located at the base and/or airport where the AFFF was used and entered the groundwater, neither the federal nor state investigators could determine the identity of the manufacturers whose AFFF containing PFAS contributed to the resulting groundwater contamination plume.

140.    Because precise identification of the specific manufacturer of any given AFFF product that was the source of PFAS in the groundwater is impossible, Plaintiff must pursue all

Defendants, jointly and severally, for those indivisible injuries which Defendants have collectively visited upon Plaintiff.

141.    Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFAS, to profit from the use of AFFF containing PFAS, at Plaintiff's expense, and to attempt to avoid liability for their contamination of the groundwater.

**Health Effects of PFOS and PFOA Exposure**

142.    As discussed above, none of the Defendants complied with their obligations to notify the EPA about the "substantial risk of injury to health or the environment" posed by their PFAS products. *See* TSCA § 8(e).

143.    In or around 1998, EPA began investigating the safety of PFAS after some limited disclosures by 3M Company and others.

144.    PFAS have been found to bioaccumulate in humans and animals. In 2005, the U.S. Department of Health and Human Services found that "human exposure to PFOA and PFOS lead to the buildup of these chemicals in the body."

145.    Because of its toxicity, eight major PFOA manufacturers agreed in 2006 to participate in the EPA's PFOA Stewardship Program. The participating companies made voluntary commitments to reduce product content and facility emissions of PFOA and related chemicals by 95% no later than 2010.

146.    The recommendations in the EPA's health advisories evolved as they learned more about the dangers and toxicity of PFAS.

147.    On January 8, 2009, the EPA issued Provisional Health Advisories for PFOA and PFOS, advising that "action should be taken to reduce exposure" to drinking water containing levels of PFOA and PFOS exceeding 400 parts per trillion ("ppt") and 200 ppt, respectively. See,

Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)[2].

148.    Many parties have studied PFOA, also known as C8, including a Science Panel formed out of a class action settlement arising from contamination from DuPont's Washington Works located in Wood County, West Virginia.

149.    The C8 panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia.

150.    Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birthweight, high uric acid, and high cholesterol. In laboratory testing on animals, PFOA and PFOS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

151.    The injuries caused by PFAS can arise months or years after exposure.

152.    Even after the C8 Science Panel publicly announced that human exposure to 50 parts per trillion, or more, of PFOA in drinking water for one year or longer had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendants repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so)

---

[2] , *https://www.epa.gov/sites/productionlfiles/2015 0-9/documents/pfoa- pfos-provisional.pdf*, at p. 1, n. 1 (last visited June 5, 2018)

that the presence of PFOA in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind.

153.     Furthermore, Defendants have represented to and assured such governmental entities, their customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate to satisfy the standards of Defendants to prove such adverse effects upon and/or any risk to humans with respect to PFOA in human blood.

154.     At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing the public from discovering the existence and extent of any injuries/harm as alleged herein.

155.     In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[3]

**Federal and State Standards for PFAS**

156.     On or around May 19, 2016, the EPA issued updated Drinking Water Health Advisories for PFOA and PFOS, recommending that drinking water concentrations for PFOA and

---

[3] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environmental Health Perspectives 123:A107–A111; http://dx.doi.org/10.1289/ehp.1509934.

PFOS, either singly or combined, should not exceed 70 ppt (parts per trillion). See, Lifetime Health Advisories and Health Effects Support Documents for PFOA and PFOS, 81 Fed. Reg. 33, 250-51 (May 25, 2016).

157.     In June 2018, the Agency for Toxic Substances and Disease Registry ("ATSDR") and EPA released a draft toxicological profile for PFOS and PFOA and recommended the drinking water advisory levels be lowered to 11 ppt for PFOA and 7 ppt for PFOS.

158.     Effective April 25, 2016, the NYSDEC added PFOS and PFOA to the New York State 6 NYCRR Part 597 list of hazardous substances, making it hazardous waste pursuant to New York State Environmental Conservation Law Article 27, Title 13 and 6 NYCRR Part 375.

159.     In 2017 the Drinking Water Quality Council ("DWQC") was created with direction to recommend maximum contaminant levels ("MCLs") for emerging contaminants, including PFOA and PFOS. The DWQC recommended MCLs to the New York State Department of Health ("NYSDOH") an MCL of 10.0 ppt or 0.0000100 milligrams per liter (mg/L) for PFOA and 10.0 ppt or 0.0000100 mg/L for PFOS.[4]

160.     Adopting the recommendations provided by DWQC, the NYSDOH is now proposing to amend 10 NYCRR Part 5 to establish MCLs of 10 ppt for PFOA and PFOS as individual contaminants.  These MCLs would apply to all public water supplies.

161.     Although the proposed regulations do not apply to private wells, the MCLs will be used by the NYSDEC as guidance to determine whether a private well is contaminated by PFOA or PFOS.

---

[4] Notice of Adoption, Amendment of Subpart 5-1 of Title 10 NYCRR Maximum Contaminant Levels (MCLs) (July 24, 2019) https://regs.health.ny.gov/sites/default/files/proposed-regulations/Maximum%20Contaminant%20Levels%20%28MCLs%29.pdf.

162.    Senate Bill S439A awaits the New York State Governor's signature. It will add a new section 159-b to the New York Executive Law that bans PFAS in firefighting foam used or manufactured in New York. The bill provides a 2-year window before the ban takes effect and requires written notification of any PFAS found in firefighting personal protective equipment at the time of sale.[5]

**Francis S. Gabreski Airport and Gabreski Air National Guard Base**

163.    Francis S. Gabreski Airport is currently owned Suffolk County.   It is located on Old Riverhead Road in Westhampton Beach, Town of Southampton.[6]

164.    Francis S. Gabreski Airport includes the Gabreski Air National Guard Base on part of its property.

165.    The United States Army developed the site in 1941 as the Westhampton Beach Army Airfield to use for gunnery training during World War II. At this time, Suffolk County owned the property, but leased it to the United States Government.[7]

166.    From 1948 to 1951, the U.S. Army discontinued its use of a majority of the property, while a private oil company leased the airfield.

167.    In 1951, the USAF reactivated the airfield as the Suffolk County Air Force Base.

168.    In 1969, the USAF deactivated the base and released it back to Suffolk County, which began operating the airfield as Suffolk County Airport, until 1991, when it was renamed Francis S. Gabreski Airport.

---

[5] The New York State Senate. https://www.nysenate.gov/legislation/bills/2019/s439/amendment/a. Accessed 27 Aug. 2019.

[6] New York State Department of Environmental Conservation, (Site https://www.dec.ny.gov/cfmx/extapps/derexternal/haz/details.cfm  (Site Code: 152261- Airport, Site Code: 152148 – Air National Guard Base)

[7] AECOM, Final Site Inspection Report Air National Guard Phase II Regional Site Inspections for Per- and Polyfluoroalkyl Substances (February 2019) available at http://afcec.publicadmin-record.us.af.mil.

169.    Military operations were reintroduced on site in 1970 when the 102nd Air Refueling Squadron of the 106th Air Refueling Group, now 102nd Rescue Squadron and 106th Rescue Wing were relocated to Suffolk County.

170.    In 1972 the federal government conveyed the air base to the Suffolk County for the development, improvement, operation and maintenance of the airport.[8]

171.    Francis S. Gabreski Airport is used by corporate businesses, private aviation and air taxi services.

172.    Francis S. Gabreski Airport is home to the 106th Rescue Wing of the Air National Guard, which operates over-water search and rescue missions, assists in disaster relief and other emergencies.

173.    The Gabreski Air National Guard Base leases 88 and a half acres, consisting of runways, hangars and maintenance/service facilities on the southwest side of the airport and a former fire training area on the southeast side of the airport.

174.    The Air National Guard Base also includes the current 0.5 acre Airport Fire Training Area.

175.    Operations at the Gabreski Air National Guard Base include aircraft and ground-vehicle maintenance.

176.    This site was previously investigated for other contaminants, including chlorinated solvents, found in the septic system, oil/mud traps, and dry wells throughout the Base.  This contamination called Installation Restoration Program Site 8 was designated Operable Unit 1

---

[8] https://www.suffolkcountyny.gov/Departments/Economic-Development-and-Planning/Francis-S-Gabreski-Airport/Airport-History

(OU01) of the Superfund Site.   The work at OU01 involved the remediation of source areas and the investigation of groundwater and ended in or about 2003.

177.    At that time, PFOA and PROS were not analyzed or investigated.

178.    The more recent, base-wide investigation of PFAS contamination is designated Operable Unit 2 (OU02).

**The Use of AFFF and Detections of PFAS at Francis Gabreski Airport and Air National Guard Base**

179.    AFFF containing 8 carbon PFAS described above has been used at Gabreski Airport and Air National Guard Base for fire-fighting, fire training and fire suppression systems starting from approximately 1970 and was only recently discontinued.

180.    In July 2016, the New York State Department of Environmental Conservation ("NYSDEC") installed six vertical profile borings at the two Fire Training Areas of the Gabreski Air National Guard Base. A groundwater sample from immediately downgradient of the current Fire Training Area detected concentrations of PFOS at 58,900 ppt and PFOA at 6,930 ppt. A groundwater sample from immediately downgradient of the former Air National Guard Fire Training Area detected concentrations of PFOS at 44,300 ppt and PFOA at 653 ppt.[9]

181.    In September 2016, the Francis S. Gabreski Airport was designated as a Class 2 Site and included in the Registry of Inactive Hazardous Waste Disposal Sites in New York State by the NYSDEC.[10]

182.    In May 2018, NYSDEC collected soil and groundwater samples at the site. PFOS and PFOA were detected in all wells, some of them showing results above the then-in-effect EPA

---

[9] New York State Department of Environmental Conservation, Environmental Site Remediation Database, https://www.dec.ny.gov/cfmx/extapps/derexternal/haz/details.cfm

[10] Letter from New York State Department of Environmental Conservation to Suffolk County, dated September 12, 2016, available at http://afcec.publicadmin-record.us.af.mil.

Health Advisory Level. Sampling results from four wells detected high concentrations of PFOS ranging from 1,130 to 58,400 ng/L. Sampling results detected high concentrations of PFOA at three wells, ranging from 312 to 12,600 ng/L.[11]

183.    NYSDEC found significant groundwater contamination at the current Fire Training Area. The highest concentration of total PFAS (300,432 ng/L) was detected there.   Significant groundwater contamination was also found in monitoring wells just upgradient of the two outfalls.

184.    The Air National Guard ("ANG") submitted a draft Final PFC Site Inspection Report November 2018. Soil and groundwater were sampled from 16 potential release locations (PRLs), excluding the current airport Fire Training Area and the two stormwater outfalls. Each of the 16 PRLs sampled had detections of PFAS and 13 PRLs had levels of PFAS exceeding the EPA Health Advisory Level. High levels of PFOS were found in shallow groundwater samples (32,000 ppt PFOS at the northern Fire Training Area).

185.    The above report and other prior investigation reports is attached to and summarized in the Final Work Plan issued by the ANG in October 2019[12]. This most recent report notes that "[P]otential receptor of concern for PFAS compounds are off-Base and include public water supply wells, domestic drinking waster wells, and hydraulic discharge areas (brooks, rivers and wetlands)."

---

[11] *Gabreski Air National Guard Base, Old Riverhead Road, Westhampton; Site No. 152148-Investigation Summary Report,* (EAR Report - July 5, 2018) available at http://afcec.publicadmin-record.us.af.mil.

[12]    Final Work Plan for the Expanded Site Inspection for Per- and Polyfluoroanlkyl Substances (PFAS) at the Gabreski Air National Guard Base (Parsons - October 2019) available at http://afcec.publicadmin-record.us.af.mil.

**Off-site Impacts and Contamination of Private Wells**

186.    An investigation of PFAS contamination at Gabreski began after Suffolk County Water Authority conducted sampling of public supply wells (2015) and private supplies (2016) proximate to the site, in areas downgradient of two Fire Training Areas and the base aircraft hangars.

187.    The sample program showed that groundwater downgradient of the base has been impacted by PFOS and PFOA, likely associated with AFFF which has been used at the base.

188.    In June 2016, the Suffolk County Department of Health Services ("SCDHS") installed 4 groundwater monitoring wells within the vicinity of the Meeting House Road Wellfield. PFOS were detected in 3 of 4 profile wells, ranging from 0.120 with the highest concentration being 14,300 ppt.[13]

189.    In October 2016, groundwater sampling occurred at the Hampton Business District, which is owned by Suffolk County and leased by Rechler Equity Partners. Groundwater sampling results from three monitoring wells indicated that PFAS was present in all of the monitoring wells. Monitoring well, MW002, showed a concentration of PFOS at 104 ng/L.[14]

190.    In 2016, SCDHS conducted an evaluation of private wells near Gabreski and identified 75 properties served by 76 private wells. Sampling of these wells revealed that 11 wells had PFOA and PFOS concentrations above the EPA Health Advisory Level.

191.    Based on these results, private well surveys in communities downgradient (in the direction of groundwater flow) from Gabreski Airport began in February 2019.  In Quogue,

---

[13] Suffolk County Department of Health Services, *Groundwater Investigation of Perfluorinated Compounds (PFCs), Air National Guard Base, Westhampton Beach* (Aug. 8, 2016) available at http://afcec.publicadmin-record.us.af.mil.

[14] ZEB Environmental Solutions, Inc., Groundwater Sampling Report Gabreski Airport, Westhampton, NY (November 17, 2016), available at http://afcec.publicadmin-record.us.af.mil.

Southampton, twenty-six properties were identified, served by 27 private wells.  In East Quogue, Southampton, there were such 28 properties.

192.    Of the private wells surveyed in Quogue and East Quogue in 2019, almost 50 were found to be contaminated with PFAS.

193.    The residents at these properties need to connect to the public supply wells of the Suffolk County Water Authority to obtain safe, filtered drinking water.

**Town of Southampton's Response Actions**

194.    The Town of Southampton has been taking remedial actions, investigating, monitoring, and otherwise responding to the PFOA/PFOS water contamination to address the threat to public health and the environment caused by Defendants.

195.    Point-of-entry treatment systems were installed at two wells to treat water through the main water line.

196.    The Town of Southampton also provided bottled water to residents after testing detected PFAS in dozens of private wells within the Town.

197.    Currently, the Town of Southampton is working with the Suffolk County Water Authority to extend existing water mains to provide properties served by private wells with the ability to tap into the public water supply.

198.    The Town Board of the Town of Southampton adopted Local Law No. 19 of 2019 to amend Code Chapter 140 (Community Preservation Fund) and Article VI of the Town's Community Preservation Fund legislation to include a new project category eligible for funding: the construction of public water mains and connections to provide drinking water to inhabitants whose drinking water supply has been contaminated by toxic chemicals, hazardous substances, or emerging contaminants.

199.    Plaintiff has also amended its Town Code by adding "Chapter 178. East Quogue Public Drinking Water Infrastructure Improvement Program". The new law allows residents to apply for rebates for the reimbursement of funds expended to achieve a connection to the public water supply for potable drinking water.

200.    The estimated cost for the water main extensions is $1.2 to 1.4 million. Surcharges and associated tapping fees are approximately $800,000. Connecting homes to the newly extended and existing water mains in the area of concern is estimated at $2 million.

201.    To date, the Town of Southampton has allocated $4 million dollars of Community Preservation Fund Water Quality Improvement funding for the extension of public water mains and reimbursement of connection costs to affected residents, to deal with the PFAS crisis.

202.    Additional costs may be incurred for the above connections, or as a result of future PFAS detections at other private wells, and other remedial measures that Plaintiff may be obliged to take to protect its residents from the impacts of Defendants' contamination.

## MARKET SHARE LIABILITY, ALTERNATIVE LIABILITY, CONCERT OF ACTION, ENTERPRISE LIABILITY

203.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as in fully set forth herein.

204.    Defendants in this action are manufacturers that control a substantial share of the market for PFAS products in the United States and are jointly responsible for the contamination of the groundwater and for causing the damages complained of in this Complaint.

205.    Enterprise liability attaches to all Defendants and the liability of each should be assigned according to its percentage of the market for PFAS materials at issue in this Complaint.

206.    PFAS is fungible once it is released into the environment. It is impossible to identify the exact Defendant who manufactured any given product containing PFAS found in the air, soil, surface water, and/or groundwater.

207.    Each Defendant participated in both the New York and national markets for PFAS products during the relevant time.

208.    Market share liability attaches to all Defendants, such that the liability of each should be assigned according to its percentage of the market for PFAS in New York at issue in this Complaint.

209.    Concert of action liability attaches to all Defendants, each of whom participated in a common plan to commit the torts alleged herein and each of whom acted tortiously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous PFAS products.

210.    Enterprise liability attaches to all of the named Defendants for casting defective products into the stream of commerce.

As and for a First Cause of Action:

NEGLIGENCE

211.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

212.    Defendants knew or should have known that exposure to PFOA and PFOS is hazardous to the environment and to human health.

213.    Defendants also knew or should have known that PFAS are highly soluble in water, highly mobile, extremely persistent in the environment, and highly likely to contaminate water supplies when released into the environment.

214.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling PFAS products would result in the contamination of the private wells that provided drinking water to the communities surrounding Gabreski Air National Guard Base and Francis S. Gabreski Airport, including in the Town of Southampton.

215.    Defendants manufactured, marketed, and sold their products with knowledge that PFAS products would be used, stored and maintained at airports and military bases, including at Gabreski Air National Guard Base and Francis S. Gabreski Airport, in such a manner that dangerous chemicals would be released into the environment.

216.    It was foreseeable that PFAS products would contaminate the surrounding environment, groundwater, and drinking water supplies of the surrounding communities.

217.    Defendants therefore knew or should have known that safety precautions should be required to prevent the release of PFAS into the surrounding environment, groundwater, and drinking water supplies.

218.    Defendants owed a duty to Plaintiff to act reasonably and not place inherently dangerous PFAS products into the marketplace when its release into the drinking water supplies was imminent and certain.

219.    Defendants owed a duty to Plaintiff not to contaminate the surrounding environment and groundwater with PFAS products.

220.    Defendants further breached their duty by failing to stem the migration of the groundwater contamination and prevent it from reaching private drinking water supplies.

221.    Defendants, as manufacturers, marketers, and sellers of PFAS products owed Plaintiff a duty to exercise reasonable care to ensure that PFAS products were manufactured,

marketed, and sold in such a way as to ensure that the end users were aware of the potential harm PFAS causes to human health and the environment.

222.    As manufacturers, marketers, and sellers, Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about their PFAS products to prevent the release of PFAS into the surrounding environment.

223.    Defendants had a duty to warn of the hazards associated with PFAS products, entering and poisoning the environment and groundwater.

224.    Upon learning of the release of the contaminants, Defendants owed Plaintiff a duty to warn and notify it of the release of the contamination before it injured Plaintiff and/or to act reasonably to minimize the damage to Plaintiff.

225.    Defendants breached duties owed to Plaintiff by allowing PFAS to be released into the groundwater and contaminate private wells that provided drinking water to residents of the Town of Southampton and failing to warn and notify the end users and/or the Town of Southampton of the resulting danger.

226.    As such, Defendants, negligently, grossly negligently, recklessly, willfully, wantonly, and/or intentionally breached their legal duties owed to Plaintiff.

227.    Defendants further breached the duties owed to Plaintiff by failing to take reasonable, adequate, and sufficient steps or actions to eliminate, correct, or remedy any contamination after it occurred.

228.    Defendants' breaches of their duties were the direct and proximate causes of Plaintiff's injuries and damages.

229.    As a result of Defendants' breach of their duty to timely notify the Town of Southampton and act reasonably in warning of the presence of PFAS, Plaintiff was forestalled from undertaking effective and immediate remedial measures.

230.    Plaintiff has suffered foreseeable damages as a proximate result of Defendants' breach of their duties as set forth above. At the time Defendants breached their duties to Plaintiff, Defendants' acts and/or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiff.

231.    As a direct and proximate result of Defendant's' breach of their duties as set forth above, Plaintiff has suffered foreseeable damages and has expended and will be forced to expend significant resources to test, monitor, and address the contamination caused by Defendants' negligence for many years to come.

232.    As a direct and proximate result of Defendants' acts and omissions as set forth above and the resulting contamination, Plaintiff has suffered damages, including but not limited to the costs incurred and to be incurred in responding to the PFAS contamination of the groundwater supply, costs expended on providing home delivery of bottled water to residents, public water main extensions, investigative costs, engineering costs, sampling, monitoring, and remediation costs.

233.    Defendants knew it was substantially certain that their acts and/or omissions would cause injury and damage. Their actions and omissions were done with actual malice, with wanton, willful, and/or reckless disregard for Plaintiff's rights.

234.    Defendants are jointly and severally liable for all such damages.

235.    Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

**As and for a Second Cause of Action:**

**PRODUCTS LIABILITY – FAILURE TO WARN**

236.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully set forth herein.

237.    Defendants knew or should have known that exposure to PFAS is hazardous to the environment and human health.

238.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling PFAS products would result in the contamination of the private wells that provided drinking water to residents of the Town of Southampton.

239.    Knowing of the dangerous, hazardous and toxic properties of the PFAS products, Defendants had the duty to warn of the hazards associated with PFAS entering and poisoning the environment and groundwater.

240.    Defendants failed to provide sufficient warning to the end users, the public, and Plaintiff that the manner in which PFAS products were used and stored at Gabreski Air National Guard Base and/or Francis S. Gabreski Airport would cause their release into the environment and cause the contamination of the environment, groundwater, and drinking water, with PFOA, PFOS, and potentially other toxic substances.

241.    Adequate instructions and warnings on the PFAS products could have reduced or avoided these foreseeable risks of harm to the environment and the threat to public health.

242.    Had Defendants provided adequate warnings, Plaintiff could have taken measures to avoid or lessen the exposure.

243.    Had Defendants provided adequate warnings, the end users of PFAS products including Gabreski Air National Guard Base and/or Francis S. Gabreski Airport, could have taken

steps to reduce or prevent the release of PFOA and PFOS into the environment, groundwater, and drinking water.

244.    Defendants' failure to warn was a direct and proximate cause of the environmental impact from PFOA and PFOS that came from the use, storage and disposal of PFAS products at Gabreski Air National Guard Base and Francis S. Gabreski Airport.

245.    As such, Defendants' failure to provide adequate and sufficient warnings for the PFAS products that they manufactured, marketed, and sold renders PFAS a defective product.

246.    As a result of Defendants' conduct and the resulting contamination, the Plaintiff has been forced to incur significant costs in responding to the contamination to the private water supplies from PFAS, including but not limited to the costs expended on providing alternative, safe, bottled water to residents with contaminated private wells, public water main extensions, investigative costs, engineering costs, environmental sampling, monitoring, and remediation costs.

247.    As a result of Defendants' manufacture, sale, and/or distribution of a defective product, Defendants are strictly liable in damages to Plaintiff.

248.    Defendants' acts were willful, wanton, reckless, and/or conducted with a reckless indifference to the rights of Plaintiff.

**As and for a Third Cause of Action:**

**PRODUCTS LIABILITY – DEFECTIVE DESIGN**

249.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully set forth herein.

250.    Defendants knew or should have known that exposure to PFAS is hazardous to the environment and human health.

251.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling PFAS products was hazardous to the environment and human health.

252.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling PFAS products would result in the contamination of the private wells that provided drinking water to residents of the Town of Southampton.

253.    Knowing of the toxic, dangerous, and hazardous properties of the PFAS products, Defendants could have manufactured, marketed, and sold alternative designs or formulations of products that did not contain PFAS.

254.    These alternative designs and/or formulations were already available, practical, and technologically feasible.

255.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to environment and human health that was caused by the Defendants' manufacture, marketing, and sale of PFAS products.

256.    The PFAS products manufactured, marketed, and sold by the Defendants are toxic, dangerous to the environment and human health, mobile, and persistent, such that the act of designing, formulating, manufacturing, marketing, and selling them was unreasonably dangerous under the circumstances.

257.    The PFAS products manufactured, marketed, and sold by the Defendants were defectively designed as the foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

258.    Defendants' defective design and formulation of PFAS products was a direct and proximate cause of the environmental impacts from PFOA and PFOS that came from the use and storage of PFAS products at Gabreski Air National Guard Base and Francis S. Gabreski Airport.

259.    As a direct result of Defendants' defective design and formulation of PFAS products and the resulting contamination and danger to human health, Plaintiff has been forced to incur significant costs in responding to the contamination to the private water supplies from PFAS, including but not limited to the costs expended providing bottled water to residents whose private wells have been contaminated with PFAS, public water main extensions, investigative costs, engineering costs, sampling, monitoring and remediation costs.

260.    As a result of Defendants' design and formulation of a defective product, Defendants are strictly liable in damages to Plaintiff.

261.    Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiff.

**As and for a Fourth Cause of Action:**

**VIOLATION OF THE UNIFORM FRAUDULENT CONVEYANCE ACT**

**(Against E. I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc. and DuPont de Nemours, Inc.)**

262.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

263.    Plaintiff seeks equitable and other relief pursuant to the Uniform Fraudulent Conveyance Act (UFCA) as adopted by the State of New York, against E. I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and

DuPont de Nemours, Inc. (collectively the "UFCA Defendants"). C.R.S. NY CLS Dr & Cr, Art 10 §§270-281.

264.    Pursuant to the UFCA: "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." NY CLS Dr & Cr §273. "Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment." NY CLS Dr & Cr §273-a. "Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent." NY CLS Dr & Cr §274. "Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors." NY CLS Dr & Cr §275.  "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." NY CLS Dr & Cr §276.

265.    The UFCA Defendants have (a) acted with actual intent to hinder, delay and defraud parties, and/or (b) were engaged or were about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business;

or (c) intended to incur, or believed or reasonably should have believed that The Chemours Company would incur, debts beyond its ability to pay as they became due.

266.    UFCA Defendants engaged in acts in furtherance of a scheme to transfer E. I. DuPont de Nemours and Company's assets out of the reach of parties such as Plaintiff that have been damaged as a result of the UFCA Defendants' conduct, omissions, and actions described in this Complaint.

267.    It is primarily E. I. DuPont de Nemours and Company, rather than The Chemours Company, that for decades manufactured, marketed, distributed and/or sold AFFF containing PFAS and PFAS for use in AFFF with the superior knowledge that they were toxic, mobile, persistent, bioaccumulative, and biomagnifying, and through normal and foreseen use, would contaminate drinking water supplies.

268.    As a result of the transfer of assets and liabilities described in this Complaint, the UFCA Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF containing PFAS and PFAS for use in AFFF.

269.    At the time of the transfer of its Performance Chemicals Business to The Chemours Company, E. I. DuPont de Nemours and Company had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF containing PFAS and/or PFAS compounds for use in AFFF.

270.    The UFCA Defendants acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and E. I. DuPont de Nemours and Company believed or

reasonably should have believed that The Chemours Company would incur debts beyond The Chemours Company's ability to pay as they became due.

271.    At all times relevant to this action, the claims, judgment and potential judgments against The Chemours Company potentially exceed The Chemours Company's ability to pay.

272.    Pursuant to C.R.S. NY CLS Dr & Cr, Art 10 §§270-281, Plaintiff seeks avoidance of the transfer of E. I. DuPont de Nemours and Company's liabilities for the claims brought in this Complaint and to hold the UFCA Defendants liable for any damages or other remedies that may be awarded by the Court or jury to the Plaintiff in this action.

273.    Plaintiff further seeks all other rights and remedies that may be available to it under UFCA, including prejudgment remedies as available under applicable law, as may be necessary to fully compensate Plaintiff for the damages and injuries it has suffered as alleged in this Complaint.

## As and for a fifth Cause of Action:

## PUBLIC NUISANCE

274.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

275.    At all times relevant to the present cause of action, Defendants were manufacturers of PFAS products, that were used for decades and were discharged or disposed of in a dangerous way, and/or otherwise cause the contamination of private wells within the area, as a result of these wells' proximity to the Gabreski Air National Guard and Francis S. Gabreski Airport.

276.    Defendants have manufactured PFAS products, in a manner that created a public nuisance and that unreasonably endangers or injures the Plaintiff, causing inconvenience and annoyance.

277.     The improper use, handling, storage, release, discharge or dispose of Defendants'
PFAS products has contaminated drinking water, the environment, soil, property and the Town of
Southampton's natural resources and drinking water supplies, thus causing a public nuisance.

278.     The above-described affirmative, voluntary, and intentional acts were performed
with the reckless disregard of the potential for PFAS to be disbursed through the groundwater,
causing a substantial interference with the use of Town of Southampton's natural resources and
drinking water supplies.

279.     Defendants' negligent, reckless, willful, and/or wanton actions and/or intentional
failures to act caused an unknown quantity of PFAS to be released into the drinking water for the
Town of Southampton, interfering with the health of a considerable number of persons.

280.     The introduction of unknown quantities of PFAS into private wells unreasonably
interfered with the use of Town of Southampton's natural resources and drinking water supplies,
such that it is offensive and has caused significant inconvenience or annoyance.

281.     The potential danger from the drinking water has caused the Plaintiff significant
inconvenience and expense, interfering with the use of Town of Southampton's natural resources
and ground water supply.

282.     Defendants are strictly, jointly, and severally liable to the Plaintiff for all resulting
damages, including the costs incurred and to be incurred in responding to the PFAS contamination.

283.     As a direct and proximate result of Defendants' acts and omissions creating the
above-described nuisance, Plaintiff has suffered and continue to suffer damages in responding to
the contamination to the private water supplies from PFAS, including but not limited to the costs
expended on providing alternative water to residents whose private wells have been contaminated,

public water main extensions, investigative costs, engineering costs, sampling, monitoring and remediating costs.

284.    As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

**Claim for Punitive Damages**

285.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

286.    At all times relevant to the present cause of action, Defendants manufactured, marketed, and sold the PFAS products that were used at Gabreski Air National Guard Base and Francis S. Gabreski Airport and that resulted in the contamination of the private water wells in the Town of Southampton.

287.    At the time the above-described, affirmative, voluntary, and intentional acts were performed by Defendants, Defendants had good reason to know or expect that large quantities of PFAS would and/or could be introduced into the environment, causing contamination of surface and groundwater, as well as private drinking water wells.

288.    Defendants' negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused an unknown quantity of PFAS to be released into the environment.

289.    The willful, wanton, malicious, and/or reckless conduct of Defendants, includes, but is not limited to:

a. issuing no warnings and failing to divulge material information concerning the release of PFAS, including but not limited to PFOA and PFOS;

b. knowing of the probability of long-lasting water contamination, including, specifically, high risks to groundwater posed by their PFAS products, and failing to prevent such contamination;

c. failing to take all reasonable measures to ensure PFAS products would be effectively disposed of and not discharged into the surrounding environment;

d. failing to prevent the foreseeable impacts of PFAS contamination upon the Plaintiff.

290.    As a result of Defendants' conduct, Plaintiff has been forced to incur and will continue to incur significant costs in responding to the contamination to the private water supplies from PFAS, including but not limited to the costs expended on providing alternative water to residents whose private wells have been contaminated, public water main extensions, investigative costs, engineering costs, sampling, monitoring and remediation costs.

291.    Defendants have demonstrated an outrageous conscious disregard for the environment and acted with implied malice, warranting the imposition of punitive damages.

292.    On information and belief, Defendants' conduct involved wanton, willful, and/or a conscious and reckless disregard for the health, safety, property, and rights of others. The Court should award the Town of Southampton punitive damages in an amount sufficient to deter and punish such conduct.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff demands judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

A. Compensatory damages that exceed the jurisdictional limit of this court;

B. Punitive damages that exceed the jurisdictional limit of this court;

C. Reasonable fees for attorneys and expert witnesses;

D. Costs and disbursements of this lawsuit;

E.   Interest on the damages according to law; and

F.   Any other and further relief as the Court deems just, proper and equitable.

**JURY DEMAND**

Plaintiff demands a trial by jury of all claims asserted in this Complaint.

Dated:   December 17, 2019

Respectfully Submitted,

**NAPOLI SHKOLNIK, PLLC**

By: /s/ Patrick J. Lanciotti, Esq.
Patrick J. Lanciotti, Esq.
Paul J. Napoli, Esq.
Lilia Factor, Esq.
360 Lexington Avenue, 11th Fl.
New York, New York 10017
(212) 397-1000
planciotti@napolilaw.com
pnapoli@napolilaw.com
lfactor@napolilaw.com